No. 15-15894

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SIERRA CLUB and NATURAL RESOURCES DEFENSE COUNCIL,

Plaintiffs/Appellees,

v.

REGINA MCCARTHY, in her official capacity as Administrator of the United States Environmental Protection Agency

Defendant/Appellee

and

The States of Arizona, Nevada, North Dakota, and Texas, the Commonwealth of Kentucky Energy and Environment Cabinet, and the State of Louisiana Department of Environmental Quality

Intervenor-Plaintiffs/Appellants

On Appeal from the United States District Court for the District of Northern California, No. 13-cv-03953-SI
Hon. Susan J. Illston

# REPLY BRIEF OF APPELLANT STATES
## Plaintiffs-Intervenors.

Paul M. Seby
Special Assistant Attorney General
State of North Dakota
GREENBERG TRAURIG LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Telephone: (303) 572-6520
Facsimile: (303) 572-6540
sebyp@gtlaw.com

Appellant States/Plaintiffs-Intervenors:
The State of North Dakota, Attorney General Wayne Stenehjem; The State of Arizona, Attorney General Mark Brnovich; The Commonwealth of Kentucky Energy and Environment Cabinet; The State of Nevada, Attorney General Adam Paul Laxalt; The State of Louisiana Department of Environmental Quality; and The State of Texas, Attorney General Ken Paxton
*(additional counsel listed on signature page)*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT ........................................................................................2

    I.    The Appellant States Are Parties to This Action, and the
        Consent Decree Adversely Affects Their Legal Rights and
        Interests Without Their Cconsent...........................................2

        A.    The District Court granted Appellant States' Motion to
                Intervene, and they enjoy all the rights of parties in this
                action. ............................................................................3

        B.    The Consent Decree impermissibly imposes burdens and
                obligations on the Appellant States and disposes of their
                claims without their consent. .....................................5

    II.    The Consent Decree Violates the Plain Language of the CAA. .........12

        A.    The deadlines in the CAA do not become a dead letter as
                soon as EPA has missed them.................................16

        B.    EPA has a nondiscretionary, judicially enforceable duty
                to label an area "unclassifiable" if EPA does not have
                sufficient information to classify it. ...........................18

    III.    The Consent Decree Is Not Reasonable.............................................21

CONCLUSION ....................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Am. Lung Ass'n v. Browner*,
 884 F. Supp. 345 (D. Ariz. 1994) ..........................................................16, 21, 22

*Barnhart v. Sigmon Coal Co.*
 534 U.S. 438 (2002)...........................................................................................13

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
 966 F.2d 470 (9th Cir. 1992) ..............................................................................4

*Catawba Cty., N.C. v. E.P.A.*,
 571 F.3d 20 (D.C. Cir. 2009)...................................................11, 14, 15, 21, 23

*Citizens For a Better Env't v. Deukmejian*,
 746 F. Supp. 976 (N.D. Cal. 1990) ..............................................................15, 22

*Club v. McCarthy*,
 No. 14-CV-05091 YGR, 2015 WL 3666419 (N.D. Cal. May 7,
 2015) ..................................................................................................................17

*Communities for a Better Env't v. U.S. E.P.A.*,
 No. C 07-03678 JSW, 2008 WL 1994898 (N.D. Cal. May 5, 2008) ................17

*Delaney v. E.P.A.*,
 898 F.2d 687 (9th Cir. 1990) ............................................................................16

*Frey v. E.P.A.*,
 751 F.3d 461 (7th Cir. 2014) ............................................................................20

*Gen. Motors Corp. v. United States*,
 496 U.S. 530 (1990)...........................................................................................14

*Johnson v. Lodge #93 of Fraternal Order of Police*,
 393 F.3d 1096 (10th Cir. 2004) ..........................................................................6

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of
 Cleveland*,
 478 U.S. 501 (1986)...........................................................................2, 7, 12, 13

*Missouri Coal. For The Env't v. U.S. E.P.A.*,
 No. 4:04 CV 00660 ERW, 2005 WL 2234579 (E.D. Mo. Sept. 14,
 2005) ..................................................................................................................17

*Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*,
 797 F. Supp. 194 (E.D.N.Y. 1992) ...................................................................23

*Reed v. United Teachers Los Angeles*,
  208 Cal. App. 4th 322 (2012), review denied (Oct. 24, 2012) ............................7

*Sierra Club, Inc. v. Elec. Controls Design, Inc.*,
  909 F.2d 1350 (9th Cir. 1990) ............................................................6

*Sierra Club v. Johnson*,
  444 F. Supp. 2d 46 (D.D.C. 2006)......................................................18

*Sierra Club v. Ruckelshaus*,
  602 F.Supp. 892 (N.D. Cal. 1984)......................................................22

*Sierra Club v. Thomas*,
  658 F.Supp. 165 (N.D.Cal.1987)........................................................16

*Sierra Club v. U.S. E.P.A.*,
  762 F.3d 971 (9th Cir. 2014) ...............................................17, 19, 20

*State of New York v. Gorsuch*,
  554 F. Supp. 1060 (S.D.N.Y. 1983) ....................................................22

*State of North Dakota et al v. McCarthy*,
  1: 13-cv-00109-CSM ........................................................................3

*Treasure State Res. Indus. Ass'n v. E.P.A.*,
  No. 13-1263, 2015 WL 6742262 (D.C. Cir. Nov. 3, 2015) .........................11, 15

*United States v. State of Oregon*,
  913 F.2d 576 (9th Cir. 1990) ...............................................6, 12, 21

*Utility Air Reg. Group v. EPA*,
  134 S.Ct. 2427 (2014).....................................................................13

## Statutes

42 U.S.C. § 7407(a) ...............................................................................8

42 U.S.C. § 7407(d) ......................................................13, 18, 21, 23

42 U.S.C. § 7407(d)(1)(A)..............................................................8, 17

42 U.S.C. § 7407(d)(1)(B)(i) .................................................................8

42 U.S.C. § 7407(d)(1)(B)(ii) ...............................................................8

42 U.S.C. § 7407(d)(A)......................................................................13

42 U.S.C. § 7407(d)(B).......................................................................14

42 U.S.C. § 7502(c)(1).........................................................................11

iii

## CERTIFICATE OF COMPLIANCE

1.      This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,254 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 and in 14-point font in the Times New Roman style.

Dated this 30th day of November 2015.

*/s_Paul M. Seby*

GREENBERG TRAURIG, LLP

ATTORNEY FOR APPELLANT STATES/PLAINTIFFS-INTERVENORS

iv

## INTRODUCTION

The District Court abused its discretion by approving a consent decree that grants more than six year extension of time to the U.S. Environmental Protection Agency ("EPA") to complete designations for the National Ambient Air Quality Standard ("NAAQS") for sulfur dioxide ("SO$_2$") ("Consent Decree"), twice the original statutory deadline of three years. The EPA, the Sierra Club and the Natural Resources Defense Council (collectively "Sierra Club") reached this "settlement" over the strong objections of the other parties in the case – Plaintiff-Intervenors Arizona, Nevada, North Dakota, and Texas, the Commonwealth of Kentucky Energy and Environment Cabinet, and the State of Louisiana Department of Environmental Quality ("Appellant States") – along with the *amici* states of Nebraska, Alabama, Alaska, Arkansas, Georgia, Indiana, Kansas, Louisiana, Ohio, Oklahoma, South Carolina, South Dakota, West Virginia, and Wyoming. Although the states have the primary responsibility for implementing the new NAAQS and for controlling air pollution within their local communities, not a single state signed the Consent Decree or filed a brief in its support.

The Consent Decree is unlawful and will disrupt the integrated designation process set forth in the Clean Air Act ("CAA") that guarantees states an influential role in making area designations. The Consent Decree is an abuse of discretion because it imposes obligations on the Appellant States and disposes of their claims

1

without their consent; violates the plain language of the CAA; and adopts a framework for designating areas with regard to NAAQS that departs dramatically and without adequate justification from the one Congress laid out. The District Court's approval of the Consent Decree should be reversed and the case remanded so that EPA will be forced to either negotiate a settlement that is satisfactory to the Appellant States as well as the Sierra Club or to demonstrate on the merits – in an adversarial proceeding – what is the appropriate remedy for EPA's admitted violation of the CAA.

## ARGUMENT

**I.    The Appellant States Are Parties to This Action, and the Consent Decree Adversely Affects Their Legal Rights and Interests Without Their Cconsent.**

Although the District Court's approval of the Order is styled a "Consent Decree," the Appellant States emphatically did not consent to the entry of this Order. And, "[o]f course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986).

Appellees do not have the authority to settle the Appellant States' claims. They try to avoid this problem by arguing that the Appellant States are not genuine

parties to the action and that the Consent Decree does not really impose obligations on the Appellant States or foreclose their rights. Both arguments are without merit.

### A. The District Court granted Appellant States' Motion to Intervene, and they enjoy all the rights of parties in this action.

The Appellant States are parties to this action. The District Court granted their Motion to Intervene in an order dated December 16, 2013. ER-422. The Court found that the Motion timely filed and that "[e]ven if, as the parties assert, the remedy in this case will be limited to a court-ordered deadline for EPA to complete its designations, the States will be directly affected because they have an interest in when EPA makes its designations." ER-423-24. In that same Order, the Court granted the Sierra Club's confessed Motion for Summary Judgment and specified that "the parties are directed to meet and confer regarding the remedy, and if they are unable to agree on the remedy, the parties shall stipulate if possible to a briefing schedule regarding the remedy." ER-424-25. In their Motion to Intervene, Appellant States specifically requested that they be allowed to intervene without filing a Complaint in Intervention, in light of the procedural posture of the case and the fact that they had already filed a complaint regarding the same claims in a related case, *State of North Dakota et al v. McCarthy*, 1: 13-cv-00109-CSM. The Court approved this request by establishing a briefing schedule and accepting the Appellant States' briefs.

EPA argues that by following through the procedure adopted by the District Court and submitting briefing on the remedial issue rather than a complaint in intervention, Appellant States have waived their rights as parties. *See* Response Brief of the United States Environmental Protection Agency ("EPA Brief") at 10 ("The Intervenor States also sought to be excused from the requirement of the Federal Rules that they file a complaint in support of their proposed intervention, because (as noted above) their own claims for relief from EPA's inaction were pending in another court .. . . Thus, even after the States' intervention as plaintiffs, the only claims before the district court for resolution remained Sierra Club's."); *see also* Answering Brief of Appellees Sierra Club and Natural Resources Defense Council ("Sierra Club Brief") at 27.

This argument is meritless. Appellant States filed their brief regarding the proper remedy for EPA's violation of the CAA in compliance with a court order, and the District Court accepted this briefing and subsequent briefing on the Consent Order. The Ninth Circuit has held that failure on the part of an intervenor to file a pleading is a mere "technical objection" and "not fatal" "where the court was otherwise apprised of the grounds for the motion." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992). Even if the approach adopted by the District Court were erroneous, the error was harmless. The parties engaged in voluminous briefing on all the relevant issues, and there was no potential for

confusion or prejudice. If EPA and the Sierra Club had wished to object to this procedure and require a complaint in intervention, they should have filed a timely motion with the District Court.

The relief that the Sierra Club had requested in the original complaint was a mandatory injunction setting unspecified deadlines for EPA to perform its mandatory duties to complete the SO2 NAAQS designations – which is precisely what the Appellant States sought as well.

**B.    The Consent Decree impermissibly imposes burdens and obligations on the Appellant States and disposes of their claims without their consent.**

On February 2, 2015, Gina McCarthy, as Administrator of EPA, filed a motion in United States District Court for the District of North Dakota, asking that court to stay the suit brought by North Dakota and other Appellant States to compel EPA's $SO_2$ NAAQS designations because "[a]ny remedy that is stipulated to or ordered in the Sierra Club matter in the Northern District of California would address the concerns that EPA anticipates the Plaintiffs would raise in this matter, and would obviate the need to litigate the issues again before this Court." EPA Motion to Hold Case in Abeyance, ER-409. The court agreed, finding "it is quite likely that the issues presented in this case will be resolved by the action now pending in the Northern District of California." ER-247. In a reversal of the position it took before the District of North Dakota, EPA now argues before this

Court that "[u]ltimately, the claims at issue are Sierra Club's, and Sierra Club can decide whether EPA has offered sufficient relief to justify the resolution of its nondiscretionary duty claims." EPA Brief at 27.

The simple fact is that EPA will only issue one $SO_2$ designation for each area, and it is nonsense to pretend that there can be one timetable for the Sierra Club and another for the Appellant States. Any court order requiring EPA to take certain actions by certain dates will affect the Appellant States' legally protected interests and could potentially foreclose their claims.

"A consent decree is essentially a settlement agreement subject to continued judicial policing[,] . . . not a decision on the merits or the achievement of the optimal outcome for all parties, but [instead] the product of negotiation and compromise." *United States v. State of Or.*, 913 F.2d 576, 580 (9th Cir. 1990) (quotation omitted). "A district court should enter a proposed consent judgment if the court decides that it is fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990). A consent decree is unreasonable when it "adversely affects [the] legal rights or interests" of the "nonconsenting intervenor." *Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096, 1107 (10th Cir. 2004). For parties that choose not to participate in a consent decree, their "rights … should be given no less respect than the rights of parties who negotiate a consent

6

decree. In other words, all parties should have the right to either voluntarily compromise a claim or litigate." *Reed v. United Teachers Los Angeles*, 208 Cal. App. 4th 322, 335-36, (2012), review denied (Oct. 24, 2012). The "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without the party's agreement." *Local No. 93, Int'l Assoc. of Firefighters*, 478 U.S. at 529. Accordingly, no "court may enter a consent decree that imposes obligations on a party that did not consent to the decree." *Id.*

Appellees do not contest that this is the correct legal standard but argue that the Consent Decree does not foreclose Appellant States' rights or impose obligations on them. This argument ignores the central role that the states play in the designation of areas under the CAA. It is impossible to issue an order imposing obligations on EPA regarding the NAAQS designations without also imposing obligations on the states, which bear the primary responsibility for drafting the designations and compiling the data to support them. And the current lack of designations leaves the states in regulatory limbo, forced to develop air quality management plans and conduct their land use planning without any certainty regarding which areas are in attainment and which will be subject to additional regulatory obligations.

In the CAA, Congress established an integrated nationwide designation process that requires EPA to (1) consider states' timely submitted designation determinations; (2) justify and consider states' concerns about any changes to the states' designations; (3) limit the designation timeline so that states' designations do not become stale; and (4) evaluate the states' designations on a reasonably level playing field. By sanctioning deadlines that far exceed the statutory requirements and nullify the states' statutory right to a designation as "expeditiously as practicable," the Consent Decree upsets the system of cooperative federalism embedded in the statutory designation process.

The CAA provides that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State." 42 U.S.C. § 7407(a). When EPA promulgates new NAAQS, it is the responsibility of the states to first prepare the preliminary designations. 42 U.S.C. § 7407(d)(1)(A). EPA's designation duties are yoked to the states' initial designations: "the Administrator shall promulgate the designations of all areas . . . submitted [by the states] as expeditiously as practicable," 42 U.S.C. § 7407(d)(1)(B)(i), and any proposed modification of the designations prepared by the states must be provided in writing to the states 120 days before the designations are promulgated so that the states have an opportunity to respond. 42 U.S.C. §

7407(d)(1)(B)(ii).  It is the states who monitor air quality conditions and draft designations – not EPA.

The Appellant States submitted their proposed designations and supporting materials about four years ago.  For example, North Dakota submitted its proposed designations on May 25, 2011, recommending that the entire state be found in attainment – which it was able to do because North Dakota's State Ambient Air Quality Standard was already more stringent than the federally imposed NAAQS, and included the 1-hour standard that is the central focus of the new NAAQS. Motion to Intervene, ER-470.  Under the schedule provided in the Consent Decree, EPA will not be required to certify these areas as attainment, or any other designation, until December 31, 2020.  Consent Decree at ¶ 3, ER-25.  At this point the data North Dakota prepared and relied on will be more than a decade old.

It is absurd to argue that this arrangement will not impose obligations on the Appellant States – unless the Court believes that EPA would be acting within its legitimate discretion to promulgate designations based on material that is a decade old.  Instead, for EPA to actually comply with the provisions of the Consent Decree, the agency will be forced to work with the Appellant States and the Appellant States will be forced to prepare or negotiate designations based on the timetable set out in the Consent Decree.  The Sierra Club concedes this in the section of its Brief titled "The Consent Decree Fully Adheres to the Clean Air

Act's Approach toward Cooperative Federalism," where it describes how the states will – and must – remain deeply involved in the process of carrying out the requirements of the Consent Decree, subject to "EPA's discretion." Sierra Club Brief at 17-18.

And the Consent Decree makes clear that EPA, in fact, intends to require extensive new data collection and that one of the reasons the agency has dragged its feet on issuing the designations was to finish promulgating the proposed Data Requirements Rule, which the Consent Decree assumed would be adopted in spite of the strong objections of many stakeholders, including several Appellant States.[1] The Data Requirements Rule is a significant regulation that requires several years and significant financial resources on the part of the States to implement, but the Consent Decree specifies that the second and third round of area designations are to be completed in accordance with the Data Requirements Rule.

There is no dispute that the designations, once promulgated, will impose additional obligations on the Appellant States, at least for non-attainment areas, but until the states know what those obligations will be, they cannot take steps to meet those obligations or plan around them. "The regulatory burdens do not flow

---

[1] "WHEREAS, the Administrator has proposed and anticipates promulgating a rulemaking that would direct states to conduct additional information collection and analyses regarding certain stationary sources of SO2, for purposes of informing future area designations under the 2010 revised primary SO2 NAAQS, see 79 Fed. Reg. 27,449 (May 13, 2014)." Consent Decree, ER-23.

instantly from the nonattainment designation, but they flow ineluctably." *Treasure State Res. Indus. Ass'n v. E.P.A.*, No. 13-1263, 2015 WL 6742262, at \*3 (D.C. Cir. Nov. 3, 2015) (publication pending).  "Designation of an area as nonattainment triggers an obligation for the state within which the area is located to modify its SIP [State Implementation Plan] (or create one), with the goal of bringing the area into attainment." *Id*.  Once this provision is triggered the state must institute "all reasonably available control measures as *expeditiously as practicable*." 42 U.S.C. § 7502(c)(1)(emphasis added).

Thus, EPA is poised potentially to impose substantial "regulatory burdens" and "obligations" on the Appellant States, but, until the designations are made, the Appellant States cannot be certain what those obligations will be or where they will fall, and they cannot prepare their SIP.  "[B]efore a state can design an appropriate SIP, it must know which areas within its boundaries comply with the NAAQS and which do not." *Catawba Cty., N.C. v. E.P.A.*, 571 F.3d 20, 26 (D.C. Cir. 2009).  This uncertainty is a serious impediment to state planning.  Only once EPA promulgates these designations will the Appellant States have the certainty necessary to apply the new NAAQS to the day-to-day work of approving projects and developing air quality plans.

When the District Court granted the Appellant States' Motion to Intervene, the Court expressly found that the States would be directly affected by the outcome

11

of the case even if resolution of the case pertained solely to the timeframe in which EPA must act to make area designations for the SO2 NAAQS: "The States will be directly affected because they have an interest in when EPA makes its designations." Order Granting Motion to Intervene, ER-424. In acknowledging that the Appellant States want EPA to proceed with making area designations for the SO2 NAAQS as soon as possible, the Court further found that it is "undisputed that if EPA designates areas within any of the intervening states as nonattainment, the States are required to take steps to bring those areas into compliance with the standard." *Id*.

Because of the structure of the CAA, which imposes obligations on the states, it is impossible for EPA to sign a Consent Decree regarding NAAQS designations that imposes obligations on EPA without also imposing corresponding obligations on the Appellant States. EPA and Sierra Club may not use the Consent Decree process to "dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986).

## II.    The Consent Decree Violates the Plain Language of the CAA.

"[B]ecause it is a form of judgment, a consent decree must conform to applicable laws." *United States v. State of Or.*, 913 F.2d 576, 580 (9th Cir. 1990).

The Supreme Court of the United States has clearly stated that settling parties may not "agree to take action [in a consent decree] that conflicts with or violates the statute upon which the complaint was based." *Local No. 93, Int'l Assoc. of Firefighters*, 478 U.S. at 526. Likewise, a federal agency does not, under any circumstance, have the "power to revise clear statutory terms that turn out not to work in practice" and draft new guidelines that effectively revise the law. *Utility Air Reg. Group v. EPA*, 134 S.Ct. 2427, 2446 (2014). *See also Barnhart v. Sigmon Coal Co.* 534 U.S. 438, 462 (2002).

Congress has directed that EPA promulgate NAAQS designations no later than three years after the promulgation of a new NAAQS. 42 U.S.C. § 7407(d). EPA revised the $SO_2$ NAAQS on June 2, 2010, 75 Fed. Ref. 35,520. The new designations were therefore due on June 2, 2013.

Congress also provided that, if there is not sufficient information to make an area designation, that area must be designated "unclassifiable": "[T]he Governor of each State <u>shall</u> . . . submit to the Administrator a list of all areas (or portions thereof) in the State, <u>designating</u> as --- . . . . unclassifiable, <u>any area that cannot be classified on the basis of available information</u> as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant." 42 U.S.C. § 7407(d)(A) (emphasis added). EPA then has two years from the date of the new NAAQS, with the possibility of a one year extension, to suggest

13

modifications to these designations. *Id*. at § 7407(d)(B). The statute, including the unclassifiable designation, is thus couched in mandatory language and represents a non-discretionary duty.[2]

If later information shows that the designations were in error, or if conditions change, there is a straightforward redesignation process that may be initiated by EPA or the states. For example, in 2004 EPA promulgated new NAAQS for certain categories of particulates and then revised the data gathering and monitoring requirements in a separate rulemaking proceeding, much as here. *Catawba Cty.*, 571 F.3d at 28. EPA was nonetheless able to promulgate the new designations less than a year after the states provided their proposed designations, and then, when the new data became available, "EPA then revised designations for eight areas from nonattainment to attainment and four areas from unclassifiable to attainment." *Id*. This is the procedure mandated by the CAA.

Congress thus drafted a statute that provides three years for EPA to complete a non-discretionary duty and a remedy in the event that EPA is either unable to

---

[2] Sierra Club argues that the only way that Congress could have written this statute so that the unclassifiable designation would be required if the deadline was missed was to include language that expressly addressed the situation where EPA missed its deadline. Sierra Club Brief at 11. Sierra Club does not cite any authorities, however, for applying a plain statement rule to consequences which flow from CAA deadlines, and the case it does cite deals with a statutory provision that the Supreme Court found "does not, by its terms, *require* the Administrator to take any action." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 538-39 (1990).

comply or wishes to prioritize other activities – a "non-classifiable" designation. "Within two years after a new NAAQS is established (extendable as in this case to three for want of adequate data), *Id.* at § 7407(d)(1)(B)(i), EPA must designate all parts of the country as being in 'attainment,' in 'nonattainment,' or 'unclassifiable' with respect to the air quality standards, *Id.* at § 7407(d)(1)(A)." *Treasure State Res. Indus. Ass'n*, 2015 WL 6742262, at *1. "Congress imposed deadlines on EPA and thus clearly envisioned an end to the designation process." *Catawba Cty.* 571 F.3d at 51. "The urgency expressed by Congress has made the [CAA's] deadlines the 'heart' of the statute." *Citizens For a Better Env't v. Deukmejian*, 746 F. Supp. 976, 985 (N.D. Cal. 1990).

Appellees and the District Court provide two arguments for why EPA may delay for six and one-half years rather than applying an "unclassifiable" designation to the areas it cannot classify. First, they argue that once the deadlines established by Congress have been missed, the statute imposes no limitation on any further delays. EPA Brief at 30. Second, they argue that the court has no authority to require a particular substantive designation, including an "unclassifiable" designation. These arguments contradict the plain language of the CAA and render its provisions a nullity.

**A.    The deadlines in the CAA do not become a dead letter as soon as EPA has missed them.**

EPA and the Sierra Club admit that it violates the CAA for EPA to delay the designations of many parts of the United States for more than nine years after the NAAQS were finalized, but they argue that once the three year deadline has passed, the statutory deadline laid out by Congress becomes irrelevant and the court may instead exercise its "broad discretion" to fashion a suitable remedy which includes a very large extension of time.

This is not the first time that EPA has made this argument after missing a deadline, and courts have routinely rejected it. "It is a semantic game to claim that once a state fails to meet an absolute deadline, a statutory gap is created because Congress has not provided a back-up deadline for its explicitly absolute deadline." *Delaney v. E.P.A.*, 898 F.2d 687, 691 (9th Cir. 1990). "When Congress has explicitly set an absolute deadline, congressional intent is clear." *Id*. "A clear cut, non-discretionary duty of timeliness is imposed if a statute categorically requires that all specified action be taken by a date-certain deadline or if such a deadline is readily-ascertainable by reference to some fixed date or event." *Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 346 (D. Ariz. 1994). "If the statutory deadline has passed by the time the court issues its decree, EPA remains obligated to issue regulations within the time frame mandated by Congress." *Sierra Club v. Thomas*,

16

658 F.Supp. 165, 172 (N.D.Cal.1987).[3]   Having missed the deadline for designating attainment and non-attainment areas, EPA is now under an obligation to make these designations as soon as possible – a process that is greatly facilitated by the fact that Congress expressly provided that when the agency did not have sufficient information to make a designation it should use the "unclassifiable" designation.  42 U.S.C. § 7407(d)(1)(A).  If EPA later concludes that any of these "unclassifiable" areas are out of attainment, it may proceed with the redesignation process, as Congress intended.   "We cannot discern any ambiguity or conflict between the Clean Air Act's enforcement requirements, and the statutory decision making deadline."  *Sierra Club v. U.S. E.P.A.*, 762 F.3d 971, 983 (9th Cir. 2014).

---

[3] An indicator of how often EPA attempts to make this particular excuse are the numerous recent, unpublished district court decisions rejecting CAA timelines proposed by EPA.  *See, e.g. Club v. McCarthy*, No. 14-CV-05091 YGR, 2015 WL 3666419, at *3 (N.D. Cal. May 7, 2015); *Communities for a Better Env't v. U.S. E.P.A.*, No. C 07-03678 JSW, 2008 WL 1994898, at *2 (N.D. Cal. May 5, 2008) ("According to the EPA as long as it completes the NAAQS process within five years of when citizens file a lawsuit contesting its failure to comply with its non-discretionary statutory duty, it need only establish a 'reasonable' schedule. However, the statutory time-frame does not begin when a lawsuit is filed, but began in 1980 and reoccurs every five years thereafter."); *Missouri Coal. For The Env't v. U.S. E.P.A.*, No. 4:04 CV 00660 ERW, 2005 WL 2234579, at *2 (E.D. Mo. Sept. 14, 2005)("The EPA self-servingly opines that nearly five years is necessary for it to review, and if necessary, revise the NAAQS for lead.").

**B.** **EPA has a nondiscretionary, judicially enforceable duty to label an area "unclassifiable" if EPA does not have sufficient information to classify it.**

The CAA gives EPA a clear directive not only as to how long the Agency has to promulgate NAAQS designations – which it has failed to follow – but also what those designations must be if EPA lacks (or believes it lacks) sufficient information within the time allotted to make a finding of "attainment" or "nonattainment." 42 U.S.C. § 7407(d). The remedy the CAA requires – and which Plaintiffs and EPA summarily reject – is that EPA immediately take the ministerial act of designating all areas of the country as unclassifiable for which EPA concluded as of June 2013 that it believed lacked sufficient data to make designations of "attainment" or "nonattainment." For those areas of the country that EPA has data showing attainment and EPA has not determined the data is insufficient, then EPA must immediately proceed to promulgate designations of attainment. "When EPA has failed to discharge a nondiscretionary duty under the Clean Air Act, a district court has jurisdiction to compel the Administrator to fulfill it." *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 52-53 (D.D.C. 2006).

Both the District Court and the Appellees argue that the court has no authority to require a particular substantive outcome – a finding of "unclassifiable." This, however, is not what Appellant States are requesting. They do not contest that EPA has the discretionary authority to look at each proposed

designation and determine whether there is sufficient information to find that a particular area is in attainment or nonattainment in accordance with regulations and applicable law. Once EPA has made the determination that there is not sufficient information available to find an area in attainment or nonattainment, however, its remaining obligations are ministerial, not discretionary – EPA must issue a designation of unclassifiable. Congress did not authorize a fourth option: to sit around and make no designation at all until new information could be gathered. By creating an "unclassifiable" designation for situations when there is not sufficient information to apply the other designations, Congress has ensured that there is no excuse for EPA not to make its designations within three years.

The cases the Decision Below relies on for the proposition that a court may not mandate particular substantive outcomes in "deadline cases" all either interpret different statutory provisions with different structures or actually support the proposition that the CAA includes judicially enforceable substantive as well as procedural provisions. Neither EPA nor the Sierra Club cite to any cases at all supporting this premise. The Decision Below relies primarily on *Sierra Club v. U.S. E.P.A.*, 762 F.3d 971 (9th Cir. 2014), stating that "rather than supporting the States' position, *Sierra Club* holds that the appropriate relief in a deadline suit is to compel the agency to act, rather than ordering a particular substantive outcome." ER-16. This is the exact opposite of the holding in *Sierra Club*, which is that

19

Congress had dictated the standard EPA was required to apply and that the agency had no discretion to deviate from it: "But the parties' protracted negotiation of the Clean Air Act's requirements—frustrating and burdensome though it may have been in this case—does not endow EPA with authority simply to waive the newly effective regulations on an ad hoc basis by 'rewriting unambiguous statutory terms' in order to serve its own 'bureaucratic policy goals.'" *Sierra Club.*, 762 F.3d at 981-82. The Decision Below also quotes *Frey v. E.P.A.*, 751 F.3d 461, 469 (7th Cir. 2014), for the proposition that "[o]ur review of EPA's actions is limited . . . to allow review only of whether EPA followed required decision making procedures." Decision Below, ER-16. The material omitted from the middle of that quotation – the ellipses – is a detailed discussion of the language of § 310 of CERCLA and the limitations that its particular provisions place on the scope of judicial review. *Frey v. E.P.A.*, 751 F.3d at 469. These cases do not stand for the general proposition that a court may not order a particular substantive outcome from EPA in a "deadline suit"; instead they are close readings of particular statutes.

The CAA provides a clear structure: any area that EPA has insufficient information to designate as either attainment or nonattainment by the statutory timeline must be designated unclassifiable, and may be redesignated once new information becomes available or if conditions change.

### III. The Consent Decree Is Not Reasonable.

The Consent Decree provides an extra six and one-half years for EPA to finish promulgating $SO_2$ designations, bringing it to a total of nine and one-half years. It does this in spite of the fact that preliminary designations have already been submitted by the states and that the promulgation of designations is exempted by statute from notice and comment requirements. 42 U.S.C. § 7407(d); *Catawba Cty.*, 571 F.3d at 32-33.

To approve a consent decree between settling parties, a Court "must be satisfied that it is at least fundamentally fair, adequate and reasonable, … [and] because it is a form of judgment, a consent decree must conform to applicable laws." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). A consent decree that affects the public interest or non-settling parties imposes a heightened responsibility on the court to protect the interests of those who did not participate in negotiating the decree. *See Oregon*, 913 F.2d at 581.

Similarly, when considering a court imposed deadline on an agency to perform a mandatory duty, the agency bears the burden of proving that it is truly impossible for it to comply with an earlier date: although "the equity court will 'not embrace enforcement ... of a party's duty to comply with an order that calls on him 'to do an impossibility'. . . the agency carries a heavy burden to show that compliance with statutory mandated deadlines is impossible or infeasible." *Am.*

*Lung Ass'n v. Browner*, 884 F. Supp. 345, 347 (D. Ariz. 1994), quoting *Sierra Club v. Ruckelshaus*, 602 F.Supp. 892, 898–99 (N.D. Cal. 1984). The Court should exercise its discretion in light of EPA's obligation to complete its overdue statutory obligations as quickly as is "practicable" or "possible." *Citizens For a Better Env't v. Deukmejian*, 746 F. Supp. 976, 984 (N.D. Cal. 1990). "Thus, at the late date of a remedial order, there can be no quarrel that time is truly of the essence." *Id.*

Because EPA so frequently misses its CAA deadlines, courts have had ample opportunity to consider what may be a legitimate excuse for a lengthy extension of time – and, much more often, what is not. "Excuses for delay must go beyond the general proposition that further study and analysis of materials will make final agency action better, because further study will always make everything better, and it is always easier to do something with more rather than less time." *Am. Lung Ass'n*, 884 F. Supp. at 347. "While the Administrator should be commended for striving to develop the fullest possible statistical basis for any regulations she promulgates, that quest must give ground in favor of expedition where Congress expressly directs the Administrator to establish standards promptly." *State of New York v. Gorsuch*, 554 F. Supp. 1060, 1065 (S.D.N.Y. 1983). EPA's desire for additional study and certainty "does not demonstrate 'impossibility,' but rather a difference in rulemaking philosophy from that evinced by Congress." *Id*. at 1066. "EPA's generalized complaints, both that the

guidelines are complex and of enormous scope and that there are competing demands on their resources, do not amount to a claim of impossibility sufficient to justify a departure from a Congressional mandate." *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 797 F. Supp. 194, 197 (E.D.N.Y. 1992).

EPA has provided several reasons why it believes that it needs three times the time that Congress provided to promulgate these designations. EPA has made significant changes in its historic processes and is conducting an "extensive national conversation" over the appropriate methodology. EPA Brief at 8. EPA was promulgating a new rulemaking regarding data collection and expects new information to become available. *Id*. at 11. EPA wishes to conduct an extensive notice and comment process, although the CAA expressly exempts these designations from notice and comment requirements, unless this notice and comment is possible within the deadlines set in the statute. 42 U.S.C. § 7407(d); *Catawba Cty.*, 571 F.3d at 32-33.

And promulgating these designations would interfere with EPA's other priorities, "including some that are subject to similar statutory deadlines." *Id*. (emphasis added). McCabe's Declaration, cited in EPA Brief and attached as a Supplemental Excerpt of Record, more candidly admits that "[m]eeting all mandatory duties imposed by the CAA with limited resources necessarily requires EPA to make choices in the prioritization and scheduling of projects, . . . [and][t]he

most significant challenge facing EPA at this time and over the next couple of years is addressing several major initiatives pursuant to the President's Climate Action Plan, including the issuance of carbon pollution standards for new (future) power plants, and the issuance of standards, regulations, or guidelines that address carbon pollution from modified, reconstructed, and existing power plants." SER 40-41. "A June 25, 2013, Presidential Memorandum directs EPA to build on state leadership, provide flexibility and take advantage of a wide range of energy sources and technologies towards building a cleaner power sector, and to propose this rule for public comment by June l, 2014, and finalize it by June 1, 2015. EPA is fully committed to meeting the deadlines established by the President." SER 41 (emphasis added).

What all of these excuses have in common is that they are problems of EPA's own making. EPA elected to revise its methodology and propose the Data Requirements Rule after it had already promulgated the new NAAQS and started the statutory clock ticking. EPA, and the Administration, elected to pursue an ambitious regulatory agenda when EPA was already struggling to fulfill its basic mandatory obligations, as detailed at great length in the McCabe Declaration. There is no implication that the Appellant States were dilatory in their own obligations under the CAA or that there have been any events that gave rise to a

24

public health crisis regarding $SO_2$. In fact, EPA expects $SO_2$ emissions to decline substantially, independent of the new NAAQS, over the next few years. SER-37.

Even assuming that the CAA allows a multi-year timeline for completing these designations, six and one-half extra years is an abuse of discretion when the original timeframe set out by Congress is exactly three years. This is particularly true because the three-tiered deadlines set by the Consent Decree allow, even require, EPA to leave for last those areas that are mostly likely to be designated attainment, areas that have no major sources and have installed new air monitors. Thus far EPA has designated several areas "non-attainment" but has refused to issue even one designation of "attainment," however carefully the states involved have collected and compiled data. The Appellant States include several states that are primarily rural or that have large areas with little population and few, if any, significant sources of $SO_2$, and these states have an interest in obtaining confirmation of what their data shows – which is that these areas are in "attainment" or have always been left unclassifiable because air monitors are not generally placed in the middle of nowhere.

The Consent Decree allows EPA to leave for last areas that have no significant sources of SO2 and small populations, although many of these areas are straightforward to classify and do not require six extra years of review. By allowing EPA to leave for last those areas that are most likely to be found in

attainment, the Consent Decree gives EPA the maximum flexibility to impose regulatory burdens by making designations of "nonattainment" without the corresponding obligation to provide regulatory certainty for areas that are in attainment. The CAA is drafted to deprive EPA of this regulatory flexibility by ensuring that all designations are completed within three years, and to grant it here is an abuse of discretion.

## CONCLUSION

The Consent Decree unreasonably burdens the rights of the Appellant States as parties to this litigation, violates the CAA, and provides EPA with a completely unreasonable timeframe for performing a straightforward task that Congress specified ought to be completed in two years, with an optional one year extension if necessary.

DATED November 30, 2015.

Respectfully Submitted,

**NORTH DAKOTA**
*/s/ Paul M. Seby*
PAUL M. SEBY
Special Assistant Attorney General
State of North Dakota
GREENBERG TRAURIG LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Telephone: (303) 572-6520
Facsimile: (303) 572-6540
sebyp@gtlaw.com

NORTH DAKOTA (cont.)
WAYNE STENEHJEM
Attorney General

MARGARET I. OLSON
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone: (701) 328-3640
Facsimile: (701) 328-4300
maiolson@nd.gov
*Attorneys for the State of North Dakota*

**KENTUCKY**
C. MICHAEL HAINES
Executive Director
Commonwealth of Kentucky
Energy and Environment Cabinet

*/s/ C. Michael Haines*
12th Floor
500 Mero Street
Capital Plaza Tower
Frankfort, KY 40601
Telephone: (502) 564-3999
Mike.haines@ky.gov
*Attorney for Commonwealth of
Kentucky Energy and Environment
Cabinet*

**ARIZONA**
MARK BRNOVICH
Arizona Attorney General

*/s/ Monique K. Coady*
MONIQUE K. COADY
Assistant Attorney General
1275 West Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-8543
Facsimile: (602) 542-7798
Monique.coady@azag.gov
*Attorneys for the State of Arizona*

**LOUISIANA**
LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY

*/s/ Spencer B. Bowman*
SPENCER B. BOWMAN
Louisiana Dept. of Environmental
Quality
Legal Division
602 N. 5th Street
Baton Rouge, LA 70821-4302
Telephone: (225) 219-3985
Spencer.bowman@la.gov
*Attorney for State of Louisiana
Department of Environmental Quality*

27

**NEVADA**
ADAM PAUL LAXALT
Nevada Attorney General

*/s/ Belinda A. Suwe*
BELINDA A. SUWE
Deputy Attorney General
Nevada Office of Attorney General
100 North Carson Street
Carson City, NV 89701
Telephone: (775) 684-1163
bsuwe@ag.nv.gov
*Attorneys for State of Nevada*
*Department of Conservation and*
*Natural Resources, Division of*
*Environmental Protection*

**TEXAS**
KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General
JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

JON NIERMANN
Chief, Environmental Protection
Division

*/s/ Nancy Olinger*
NANCY OLINGER
Assistant Attorney General
Environmental Protection Division
(MC-066)
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2012
Nancy.olinger@texasattorneygeneral.gov
*Attorneys for the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Paul M. Seby*